My name is Jorge Paredes and I represent Trafon Group, Inc. Your Honors, this case in essence deals with a clear error of law in extending the holding of this court into basic contralex court versus Klockner-Mueller court to the facts of this case. And although I'm well aware that matter has been briefed and facts are known to the court, I would like to just summarize some salient facts that need to be addressed for the argument to flow. And these are the following. In June of 2009, the seller of these products that my client acquired notified Butterball that it had sold the distribution rights that V. Suarez had on these particular products, which are whole turkeys and boneless breasts of turkeys. There is an acknowledgment on the part of Butterball in the appendix on page 214, which specifically acknowledges that they were informed of the change in the distribution. Subsequent to that, the deal went through and my client started the distribution of these specific Butterball products. Up to that point in the record in the hearing that we had before the magistrate judge, it's clear that V. Suarez had been the sole distributor and subsequently my client became the sole distributor. There are, and the record shows that from 2009 all the way up to 2011, there were spot sales made by other distributors here in Puerto Rico of the products of which my client held the exclusivity. Trafón every single time wrote to Butterball and expressed its dissatisfaction in that it was in fact a breach of its exclusive rights. On none of those occasions, the response from Trafón, I'm sorry, from Butterball was that, well, you're not exclusive, I have every right to sell to whomever I want. That was not the response. That's what Ricardo Casillas said the very first time. Let me get to his letter, which is in fact the thrust of the district court's opinion. That letter was sent by counsel. It was sent to me. It was not sent to the party. It was in response to a complaint that Corch Foods had become a distributor. Well, not that it had become a distributor, Your Honor. I wrote the letter complaining of the fact that we had seen that there were some products being sold by Corch. And Mr. Casillas, in my letter to him, I expressly said my client has exclusive rights. And he denied it and said you're not exclusive. And he denied it and said they're not exclusive. Why doesn't that start the statute of limitations running? Okay, that doesn't start the statute, Your Honor, because one, it does not express notice. We have to understand that what is the concept of this notice, okay? And it has to be expressed. And it has to be, and for the statute to trigger with the Act 75, Section 278D, and even the basic case holds it, it has to be a definitive act of impairment or termination. Well, there's more in the letter, too, isn't there? I mean, every time they send you an invoice, they would say, as confirmed by way of the letter, blah, blah, blah, we're selling you these, are not done so on a non-exclusive basis. Nothing contained in this invoice, nor any other act or measure or act of murderable, is intended to grant you with any exclusive rights in Puerto Rico or elsewhere. Yes, Your Honor. And that's not just a once. Every time you get an invoice, how many hundreds of invoices we're talking about. And, Your Honor, the fact is, at the hearing, it was established that nobody from management saw those invoices. Those invoices were sent to a clerical staff member who simply paid no attention to that and never raised it to management to be able to respond. Their fault or your fault? I'm sorry? The fact that people don't talk to the people that receive the invoices, is that the murderable's fault? No, Your Honor. I think it's very convenient that, you know, you string along somebody and say, because, I mean, the manner in which it's done, Your Honor, there was plenty of communication between Mr. Ashley, Randy Ashley, Joel Coleman, Scott Singleton, with the managers of the company, with Mr. Trappara and Mr. Piantoni. The record is replete, and I can just point out for the appendix, in these precise letters where they string Torfon along, there in the appendix from pages 278 all the way to 299, and none of those emails or letters, Your Honor, they conveniently cite the language you just started, you just stated. That was buried in an invoice, which they knew perfectly well nobody was going to see, except some clerk that gets the invoice and pays it. And that's just, you know, if it's anybody's fault, sure. It's your fault's fault. But I think it's very disingenuous to think that that was proper notice. I'm sorry. Can I just ask one more question? Sure. Then I'll shut up. Is this a commercial contract? Yes. So does the commercial code say anything about how commercial contracts are supposed to be performed? In terms of? Being in writing? Oh, no. I think, Your Honor, there's plenty of law on that, and it goes on both sides, actually. Uh-huh. I think, Your Honor, that the gist, and I think the right perception is, I think this opinion is written by Judge Garcia-Gregory, although it mainly adopts the reporting recommendation of Magistrate Judge Carreno. It's important, Your Honor, because that's exactly what the judge and magistrate did. They said, oh, under Article 82, we can't say this is a contract. Now, Judge Garcia-Gregory reversed himself in the Volkswagen, the VW versus old-fashioned, 84F2nd3rd82, and in there, Judge Garcia-Gregory candidly admits that he was wrong in his analyses of a prior case that he had written, EA Hacking Court versus Nuremberg Cup Holdings, which is an unpublished opinion, but it's cited by the magistrate, in which they basically say, we can't really look at course of conduct. And they realized that, you know, they were wrong, because this court in Welch, R.W. Welch, I mean, Thomas Ward versus R.W. Welch, this court clearly held what had been clearly law here in Puerto Rico for a long, long time, which is because it's the essence of Law 75, of Act 75, that tells you that it's not a document what creates the relationship and what creates the commercial contract, per se. It's the fact that you sell, you distribute, you inventory, you take the credit risk. Counselor, you're… Garita, you're… Yes, Your Honor. I'm sorry. I'm sorry, Your Honor. I was referring to our case of Garita. Yes, Your Honor. Holds different. I'm sorry. No, thank you. Your client seems to be in a particularly poor position to rely on course of conduct in this sense. I mean, your client really had no course of dealings with Butterball. You claim to have, in effect, acquired this exclusive right through this asset purchase agreement. So you're in a situation, there's no written document of the prior distributor confirming an exclusive arrangement, and you're not in a position, it seems to me, because you only claim this exclusive right through this acquisition. Your client, again, had no course of dealing with Butterball at all. Prior… May I? Please. Prior to 2009, you're absolutely correct. Okay. There was no prior dealing. The dealing was with VSORS, and Mr. Coleman testified at the hearing before the magistrate judge that VSORS had been essentially the sole distributor. Right. And then almost immediately, you get the Casillas letter, and then you get this disclaimer on all of these invoices, and in addition to that, you have Butterball acting in a way that indicates they don't think there is any kind of exclusive arrangement. No, Your Honor, but you see, that's the key. The key here is these e-mails and letters that I've made reference to in the appendix, because had they said, okay, letters from an attorney, you know, I have an opinion that it's exclusive. He has an opinion that it's not exclusive. So what were to… I'm sorry. My time apparently is up. No, please finish. Okay. So what were we to do? Had I come to this court with a declaratory judgment action in 2009 after receiving Mr. Casillas' letter and saying, you know, he says exclusive, he says not exclusive, I say exclusive, tell us something. I'm sure any judge would have said, well, where's your harm? Where's the sale been done? Because the Quirch sale never happened. And all the other little sales that happened throughout, their response was, I didn't know about it. I don't know why that happened. You are my sales agent. And I want to make a reference very quickly. But you alleged that there were sales to Quirch. You alleged it in the letter. Yes, I alleged it. But it turned out to be that what Waterville said is I didn't do those. We didn't put those products into the market. I didn't sell it to Quirch. The same thing that they said later when they said that they hadn't sold it to products that appeared in Selecto. You have to understand your answer to the… You said the court would have asked you where's the injury, where were the sales. You would have said Quirch Foods. But there weren't any. At the end of the day, there weren't any. It's not in the record, but when they responded, it said there were no sales to Quirch. So what? It's your allegation. No, no, I know because that's what my client told me at the time. They had seen the product. What Waterville said is I didn't sell them to Quirch. And they said we don't have an exclusive arrangement. With you. But then, if I may, for the next two years, they didn't say so. They just allowed us. And very briefly… We've got it. The basic point of… We've got it. Thank you, Your Honor. Good morning. May it please the Court, Luis Oliveira on behalf of Butterball. Your Honor, we're asking this Court to affirm the District Court's decision denying preliminary injunctive relief and dismissing the complaint on statute of limitations grounds as grounded on the clear and binding precedent of this Court, which is the basic controls. None of the arguments raised, as can be gleaned by the questions from the panel, counsel any other result. I want to begin by addressing a couple of the issues that counsel raised just now. Counsel stated that Quirch sales never happened. That's not on the record. The record says from his own letter that sales were ongoing to Quirch sales. That was the basis for the complaint. And the basis for the response from Butterball's counsel, Ricardo Casillas at the time, where he goes on in detail to explain that Butterball had a history of selling in Puerto Rico, doing business with various resellers on a non-exclusive basis. The letter also states that they never granted exclusive rights to Trayvon or any of its predecessors and that the relationship has always been non-exclusive. The letter also states that, and I quote, we trust these explanations to clarify Butterball's position and legal and business rights going forward. So I think it's difficult to think of a more clear statement than that. If anything, it's a stronger case than basic controlics. If you remember the facts in basic controlics where the principal who had, it was an undisputed fact, that had previously awarded exclusive rights, sometime later sent a letter to the same exclusive distributor saying, from this point forward we're going to be selling through other people as well. In this case, as the original complaint letter on October 2009 from Counsel Payette stated, there had already been sales to Quirch Foods and other distributors, which Trayvon's letter itself identified as a clear violation of what they thought were exclusive rights under Law 75, even citing Law 75 for that proposition in its own letter. So with respect to Uranium's right, the allegation in the complaint was that they acquired these exclusive rights in the asset purchase from another local distributor package provision. The reality is, and he mentioned that Butterball had been asked to confirm knowledge or was given notice of this transaction. The fact is that a letter was sent to a Mr. Randy Ashley, who is not an employee but an independent agent of Butterball, and he was simply asked to acknowledge receipt of that letter. So there was no, Trayvon, the evidence was that Trayvon did not ask to see a contract between Packers and Butterball to confirm whether in fact there was exclusive rights. They did not communicate with Butterball to confirm whether such exclusive rights were awarded at some point to Packers. They never sought the consent of Butterball for this transfer of so-called exclusive rights. The asset purchase agreement nor the escrow agreement, both of which were submitted to evidence by counsel, neither mentioned any exclusive rights over the Butterball lines. And there is evidence on the record, Exhibit I, that shows that there were sales ongoing to retailers and other distributors. But counsel, excuse me, there's a, it's an equitable stop argument they make. I mean, they say that even after the Casillas letter, they would complain about sales by Butterball that they felt violated this exclusive arrangement, and in response to those letters, Butterball would acknowledge that these sales were not appropriate and would pay commissions to Trayvon because, they would say because it was a recognition that these sales should not have taken place. And so because of that pattern of response by your client, they felt that your client was acknowledging that there is in fact an exclusive arrangement. Well, first of all, that's an argument that was of subsequent vintage raised not before the magistrate's judge, but afterwards for the first time in the objections to the magistrate's report and recommendation, and therefore it's waived. Even if considered, though, the case law which is cited by appellants for that proposition differs widely from the facts of this case. The case law supporting the use of equitable estoppel, first of all, the Puerto Rico case law cited in the Matos Santos case that they cited is in the context of tort actions. And specifically, the case that originated the equitable estoppel doctrine in Puerto Rico was a slip and fall where a plaintiff fell in Pueblo, a supermarket retailer in Puerto Rico, and when Pueblo received the extrajudicial claim, Pueblo asked the plaintiff to contact their adjuster to try to work out a solution to the problem. And after a year and no solution was forthcoming where the plaintiff sued Pueblo, Pueblo then said, oh, no, that person you were dealing with, he doesn't represent me. And that's what the court said, no, no, no, you can't do that. You are, therefore, equitably estopped from raising this defense of statute of limitations. That's wildly different from what they're claiming. They're basing their argument of equitable estoppel on these permissions that were paid on a couple of instances, certainly not on every sale. For example, they acknowledged that there were ongoing sales that they were aware of at all times to Walmart and Costco. There was a sale to a corner, another local supermarket retailer that were commissions were also not paid. And there's no, on this record, there's no evidence whatsoever of any representation that, yeah, you have exclusive rights, which is what happened, by the way, in the Matos Santos case that they cited. But why pay the commissions? What is the inference? The testimony by Butterball's executives was that if there was a particular sale where they felt Mr. Coleman and his assistant, Scott Singleton, felt that there had been a participation by Trayvon in generating or helping with the sale, then they would consider giving a commission. That was the testimony. That is on the record. Secondly, if the argument is that as a matter of law that somehow constitutes an acknowledgment of exclusive rights, this court's case, medical books case, which is cited in the brief, has a statement to the effect that commissions by themselves do not an exclusive agreement make. The final argument that they raised, which was also not presented before the magistrate and therefore has also been waived, is this notion that a different, what they call a de facto exclusive, somehow arose at some unspecified point post-2009. That is simply not supported by any evidence on the record. The testimony by the Trayvon executives themselves was that, you know, exclusivity was not an issue that was discussed other than in the October 2009 correspondence where it was clearly rejected and denied. And only thereafter in 2012 in the context of a negotiation of a potential non-exclusive written agreement. So there simply is not the evidence there to support their argument that there is some kind of different de facto exclusive at any point thereafter. Are you familiar with the Gareta Hotel case? I am, Your Honor. And that was the third point that I wanted to, the last point that I wanted to address brought in by counsel. He mentioned Judge Garcia's decision in the old-fashioned case where he reversed himself. Well, he also sought to reverse this court because he said not only was he wrong, but he thought this court was wrong in its reading in Gareta of the pertinent Supreme Court Villar versus Owens-Illinois case, which is the source of the Article 82 Commerce Code requirements that require written corroboration to establish not only the existence, but as is the holding in Gareta, the essential terms of a written commercial agreement, of a commercial agreement. And there's no question that distribution agreements are commercial agreements subject to the Commerce Code. But isn't Section 278 more specific than 82? How do we decide which one to apply? Well, they're not mutually exclusive and there's no conflict between them. As the Puerto Rico Supreme Court has stated, Article 82, what it does is it establishes an evidentiary requirement where a... Isn't there tension between that and our cases that say under Law 75 course of dealing is enough? Well, course of dealing, only if it includes such written corroboration. But we haven't said that, have we, under Law 75? I don't think you have said that course of dealing without any written... I don't think this court has stated one way or the other, I guess. Okay. There's some case law in the district court level, but not by this court that I can remember. Thank you. Thank you both.